IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

        Plaintiff,

vs.                                      No. CR-11-2432 MCA

MARIA BUNDY,

        Defendant.

## **ORDER**

This case is before the Court upon Defendant's *Motion to Suppress Involuntary Statements*. [Doc. 15] The Court has considered the written submissions of the parties, the record in this case, the evidence adduced at the January 23, 2012 evidentiary hearing, and the pertinent law, and is otherwise fully advised.

**Background**

This case arises out of a March 5, 2011 rollover accident in which Larry Mark, one of three occupants of a pickup truck, received fatal injuries. The two remaining occupants, Defendant and Roland Deale, the owner of the truck, were seriously injured, but recovered. Other than the three occupants, there were no eyewitnesses.

The identity of the driver is hotly disputed. Shortly after the accident as he lay fatally injured on the ground, Mark told police that Deale had been driving. Mark's statement is corroborated by the grand jury testimony of Joanne Bitsilly and the July 1, 2011 Statement of Conway Mark, Larry Mark's brother, both of whom recall that Roland Deale was driving as the truck drove away from Larry Mark's home, the last known stop prior to the accident. Mark's statement is contradicted by a statement Roland Deale made to his physician while recovering

from his injuries at the San Juan Medical Center.  On two other occasions, one before and one

after the statement to his physician, Deale denied remembering who was driving.  The parties

have retained "dueling" accident reconstructionists who have reached conflicting conclusions as

to whether Roland Deale or Defendant was driving at the time of the accident.

**Law of Involuntary Confessions**

In deciding whether Defendant's statements were voluntary,[1] the Court relies on the

following well-established principles:

> The Government bears the burden of showing, by a preponderance of the
> evidence, that a confession is voluntary.  The question this court must resolve is
> whether
>> the confession [is] the product of an essentially free and
>> unconstrained choice by its maker? If it is, if he has willed to
>> confess, it may be used against him. If it is not, if his will has been
>> overborne and his capacity for self-determination critically
>> impaired, the use of his confession offends due process.
>
> Further, "[w]hen the government obtains incriminating statements through acts,
> threats, or promises which cause the defendant's will to be overborne, it violates
> the defendant's Fifth Amendment rights and the statements are inadmissible at
> trial as evidence of guilt."  This court determines the voluntariness of a confession
> based upon the totality of the circumstances, considering "both the characteristics
> of the accused and the details of the interrogation." "No single factor is
> determinative."

*United States v. Lopez*, 437 F.3d 1059 (10th Cir. 2006) (citations omitted).

**Findings of Fact**

**The Court finds that:**

1.      On the morning of May 5, 2011, a family member drove Defendant to the

---

[1]At a  December 10, 2012 hearing, Defendant's counsel confirmed in response to the
Court's inquiry that Defendant is no longer challenging her statements on the ground that they
were obtained in violation of her *Miranda* rights. Therefore, the voluntariness of her confession
is the only ground for suppression before the Court.

Shiprock office of the Bureau of Indian Affairs where the office of Navajo Nation Criminal

Investigator Jefferson Joe was located.

2.      Defendant had previously agreed to submit to a polygraph examination.  [Doc. 47

at 100]

3.      At approximately 10:00 a.m., Defendant was shown into an interview room and

introduced to FBI Special Agent Jennifer Sullivan.  [Doc. R]  Defendant's family member was

not present and Defendant was not represented by an attorney. [Doc. 47 at 23]

4.      Defendant was using a walker and appeared "a bit disabled." [Doc. 47 at 20]

5.      The case agent, Special Agent Jonathan Mackay, was also present, and observed

the interrogation through a one-way glass mirror. [Doc. 47 at 102]

6.      Prior to the  interrogation, Agent Sullivan had reviewed various documents

prepared by or collected by Agent Mackay.  [Doc. 47 at 11]

7.      Agent Sullivan had not reviewed the two reports of the accident  prepared by

Officer Lambert Deschine of the Navajo Police Department. [Doc. 47 at 61; Ex. A, B]

8.      Agent Sullivan had not reviewed CI Joe's report of his interview of Joanne

Bitsilly. [Doc. 47 at 63; Ex. E]

9.      Agent Sullivan had not reviewed Agent Mackay's "302" of his interview of

Valerie Deshnod. [Doc. 47 at 63; Ex. F]

11.      Agent Sullivan could not recall whether she had reviewed Agent Mackay's "302"

of his  interview of Alex Deshnod. [Doc. 47 at 63]

12.      Agent Sullivan had not reviewed Agent Mackay's "302" documenting his

interview of Alan Maxwell. [Doc. 47 at 63; Ex. J]

13.     Agent Sullivan had not reviewed Agent Mackay's "302" of his April 7, 2011 interview of Dr. Dunsworth.  [Doc. 47 at 63; Ex. K]

14.     Agent Sullivan specifically recalled reviewing Agent Mackay's "302" of his interview of Defendant [Doc. 47 at 59; Ex. C] and his "302" of his interview of Roland Deale. [Doc. 47 at 63; Ex. H]

15.     Defendant appeared sober and lucid.  [Doc. 47 at 21]

16.     Defendant reviewed and electronically signed FBI polygraph-consent and *Miranda*-waiver forms. [Doc. 46 at 16-19, 22-24; Exs. M, N]

17.     Defendant was 40 years old [Ex. R] and had some college education. [Doc. 47 at 20]

18.     Defendant was taking percocet, oyxcodone and muscle relaxants.  [Ex. L] Agent Sullivan is not knowledgeable about the side effects of these medications. [Doc. 47 at 66]

19.     Defendant more likely than not was still in pain from the severe injuries she suffered in the March 5, 2011 accident.

20.     Defendant was extremely remorseful over Larry Mark's death.  Defendant was distraught at the prospect of going to prison and losing her children.  [Doc. 47 at 40;  Ex. R]

21.     Agent Sullivan began by interviewing Defendant.  According to Agent Sullivan an "interview" is "an overall discussion about the person, maybe their biographical information, maybe their personal health, possibly for them to give somebody like me the--their idea of what happened on that day, their side of the story[.]"  The interview lasted about forty-five minutes to an hour.  [Doc. 47 at 16]

22.     During the interview, Defendant recounted the chain of events on the date of the

accident. She recalled drinking 5-6 beers throughout the day of March 5, 2011.

23.     During the interview, Defendant recalled that the last thing she remembered  was

sitting in the driver's seat of the truck, which was parked outside Alex Deshnod's residence.

24.     Agent Sullivan confronted Defendant with the fact that normally someone of

Defendant's size would not be expected to pass out from drinking 6 beers.  Defendant

nevertheless remained adamant that she had blacked out.

26.     Agent Sullivan does not appear to have been aware that Defendant's post-accident

BAC was .299 [Doc. 47 at 97],  which would have been consistent with Defendant's statements

that she blacked out, but inconsistent with her statement about the number of beers she had

consumed.

27.     Defendant at no time admitted to having an actual recollection of the accident.

28.     Agent Sullivan administered a polygraph test, the ostensible reason for having

Defendant appear at CI Joe's office.  The test included two relevant questions: (1) "Do you know

for certain who was driving the truck at the time of the accident? and (2) "Did you lie to police

when you said you blacked out before the accident?"  Defendant answered "No" to both

questions.

29.     Agent Sullivan determined Defendant had "failed" the polygraph test: *i.e.*,

Defendant's physiological responses indicated to Agent Sullivan that Defendant was deceptive

when she  answered "No" to both of the relevant questions.

30.     Agent Sullivan told Defendant that she had failed the polygraph, that she was

"miserably deceptive."  [Doc. 47 at 33]

31.     Following the polygraph test, Agent Sullivan's questioning became more

confrontational. [Doc. 47 at 43]

32.     From the point that Agent Sullivan concluded that Defendant had "failed" the polygraph, Agent Sullivan's interest in determining the actual facts was subordinated to the FBI's interest in obtaining a confession.

33.     Agent Sullivan did not know there was evidence that Defendant, Deale, and Larry Mark had stopped at Mark's residence after leaving the Deshnod residence. [Doc. 47 at 66, 75, 85]

34.     Agent Sullivan therefore conducted her interrogation with the assumption that if Defendant admitted to driving as the truck left the Deshnod residence, Defendant had as good as admitted she was driving at the time of the accident.

35.     At the evidentiary hearing, Agent Sullivan agreed that if there had been another stop after the truck left the Deshnod residence that fact would have been "significant." [Doc. 47 at 75]

36.     During the interview,  Defendant did not recall visiting Larry Mark's residence prior to the accident. [Doc. 47 at 85]

37.     Agent Sullivan's questioning was based on the hypothesis that if Defendant was driving when the truck left the Deshnod residence, Defendant necessarily would have been driving at the time of the accident.

38.     Agent Sullivan engaged in suggestive and confrontational questioning.

39.     Although Agent Sullivan was not aware of Defendant's extremely elevated BAC, Agent Mackay, who was monitoring the interrogation through the one-way mirror, did have knowledge of Defendant's BAC.

40.     "Eventually," Defendant told Agent Sullivan that "I was in the driver's seat and am sure I drove off." [Doc. 18-2 at 3]  Because Agent Sullivan did not know there was evidence that the truck had stopped at Larry Mark's residence after leaving the Deshnod residence, Agent Sullivan assumed that Defendant had confessed to driving at the time of the accident.

41.     Agent Sullivan, hoping to obtain additional incriminating statements,  encouraged Defendant to write two statements.  Defendant wrote out two equivocal statements, neither of which admits that she was driving at the time of the accident.  [Ex. O; P]

42.     After obtaining the two written statements, Agent Sullivan left the interview room and briefly conferred with Agent Mackay.  [Doc. 47 at 79, 106]

43.     Agent Sullivan, accompanied by Agent Mackay, re-entered the interview room, at which time Agent Mackay took over the interrogation. [Doc. 47 at 82]

44.     Defendant continued to maintain that she could not remember details of the vents leading up to the accident or who was driving at the time of the accident. [Ex. Q ]

45.     Agent Mackay, concerned that the statements written by Defendant were not sufficiently inculpatory, asked Defendant "Do you know for a fact that you drove the vehicle?" Defendant responded with an equivocal "I'll say yes."  [Doc. 47 at 107; Ex. Q]

46.     Agent Mackay, still not satisfied that he had a sufficiently clear admission,  asked Defendant  "Do you know for a fact that you drove the vehicle and were the driver during the collision?"  Defendant answered "Yes." [Doc. 47 at 107; Ex. Q]

47.     Throughout the interrogation,  Defendant steadfastly insisted that she had not lied when she said she blacked out and that she did not recall the accident. [Doc. S]

48.     The interrogation concluded at 1:30 p.m., approximately three and one-half hours

7

after Defendant entered the interview room. [Doc. L]

49.     Roland Deale, the other surviving occupant, and the person identified by Larry Mark as the driver, was not subjected to a polygraph.

50.     Agent Sullivan does not take notes during an interrogation; consistent with this practice, she prepared her report of Defendant's polygraph examination and interrogation after the fact, from memory. [Doc. 47 at 49-50]

51.     Agent Sullivan's report of Defendant's three and one-half hour interrogation contains significant gaps at crucial points in the interrogation. Her report fails to record the actual words of the participants at many points and does not capture crucial nuances such as tone of voice, pauses, and body language.

52.     During the evidentiary hearing on Defendant's motion to suppress, Agent Sullivan repeatedly could not recall details of the interrogation beyond those recorded in her report. [Doc. 47 at 72, 73, 74]

**Analysis**

The Court is severely handicapped in its assessment of the voluntariness of Defendant's statements by the United States' failure to electronically record the interrogation leading to her statements.   The FBI agents who conducted the interrogation clearly knew and intended that any inculpatory statements given by Defendant would be the centerpiece of the United States' case if charges were brought against Defendant. Yet, consistent with FBI standard operating procedures, the interrogation was not recorded, resulting in the loss of irreplaceable information, such as the actual words spoken by the participants, their body language, facial expressions and tone of voice, and other nuances that cannot be conveyed by an after-the-fact, written report.   The

following excerpt from Agent Sullivan's report of the interrogation provides a perfect illustration of this loss of crucial information:

> Bundy was told that she had failed the polygraph examination. *Initially* she maintained that she had blacked out and did not recall driving, however *eventually* became emotional and stated that it was likely that she was the driver considering that she had been the driver throughout that day.  (Emphasis added).

Agent Mackay's report presents similar problems:

> BUNDY *initially* claimed to not remember the incidents that led up to the vehicular collision or who actually drove the vehicle during the collision.  *A few minutes later* BUNDY recanted and admitted she knew for a fact that she was the driver of the vehicle during the collision. (Emphasis added).

What is missing are the details of what was said in the critical intervals during which Defendant moved from *no recollection* to *certainty* that she was driving.  What portion of the three and one-half hours that Defendant was present in the interview room was consumed between "initially" and "eventually"?  How long was "a few minutes"?  What techniques were employed during these gaps at critical points in the interrogation?  The Court cannot require the United States  to record interrogations.  But if the United States fails to record interrogations, it must bear the consequence in cases such as the present where the actual words employed by the participants, their tone of voice, and their body language are necessary factors in the Court's voluntariness analysis.[2]  The irretrievable loss of crucial information bearing on the voluntariness of

---

[2]It appears from an internal FBI memorandum that the policy of not recording interrogations is driven in part by the FBI's disdain for juries:  "[A]s all experienced investigators and prosecutors know, perfectly lawful and acceptable interviewing techniques do not always come across in recorded fashion to lay persons as proper means of obtaining information from defendants.  Initial resistance may be interpreted as involuntariness and misleading a defendant as to the quality of the evidence against him may appear to be unfair deceit."  Memo of March 17, 2006 from FBI Office of the General Counsel Investigative Law Unit to All Field Offices, All HQ Divisions. Available online at judiciary.house.gov/hearings/pdf/DOJDocsPt4-1070319.pdf.

Defendant's statements was underscored by Agent Sullivan's testimony during the January 23, 2012 evidentiary hearing that "my recollection would have been much clearer back in May 2011 that it would be now.  I can only defer to what the report says."  [Doc. 47 at 85-86]  Since the United States, not Defendant, bears the burden of proof, these evidentiary lacunae at critical points in the interrogation constitute a failure of proof on the United States' claim that Defendant's statements were voluntary.

During the interrogation, Defendant steadfastly maintained that she had no recollection of the accident.  This is not a case in which such a claim of loss of memory is inherently suspect.  It is undisputed that Defendant was extremely intoxicated at the time of the accident and was ejected from the truck, suffering severe injuries.

It is true that, in Agent Sullivan's opinion, Defendant failed her polygraph examination. However, if Defendant did not recall stopping at Larry Mark's residence prior to the accident, she may have believed that the Deschnod residence was the last stop before the accident, and her responses to the relevant questions merely would  have indicated that she was lying about who was driving as the truck left the Deshnod residence.  She has consistently denied recalling the accident and the events after she was sitting in the driver's seat of a vehicle at the Deshnod residence.  The Court has serious concerns that during gaps in the record of the interrogation, Defendant was induced by psychologically coercive techniques  to confess to matters as to which she had no actual recollection.[3]

---

[3]Even though the Court accepts that the agents testified in good faith, there are recognized problems with such testimony, including "problems associated with recollection," "disparities in perception or preconceived biases," and statements that have "equivocal interpretations."  B. Boetig, *et al.*, *Revealing Incommunicado:  Electronic Recording of Police Interrogations*,  Vol. 75, No. 12,  FBI Law Enforcement Bulletin 1 (Dec. 2006).  "People,

Agent Sullivan, the agent who conducted the initial portion of the interrogation and administered the polygraph examination, was ill-informed about crucial facts of the case. In particular, she did not know that Defendant had had a BAC that was consistent with her claim that she blacked out, and, most importantly, she did not know that Alex Deshnod's residence may not have been the last stop prior to the accident. This lack of crucial facts led her to misinterpret and disbelieve Defendant's responses:

> During the interrogation, if the investigator determines that a suspect's denials are deceptive, then the investigator increases the amount of psychological pressure applied against the suspect. This process, of course, goes astray when the interrogator mistakenly interprets the suspect's truthful denials as deceptive denials. In that case, as the suspect offers additional truthful denials, the interrogator ratchets up the psychological pressure through the use of interrogation tactics.

Major Peter Kageleiry, Jr., *Psychological Police Interrogation Methods: Pseudoscience in the Interrogation Room Obscures Justice in the Courtroom*, 193 Mil. L. Rev. 1, 30 (Fall, 2007) (footnotes omitted). An interrogator who did not know that Defendant had a BAC of .299 after the accident would have tended to dismiss Defendant's assertion that she passed out from drinking, just as Agent Sullivan did. Similarly, an interrogator who was unaware of evidence that the truck stopped at Larry Mark's residence shortly before the accident would not have understood how Defendant could have recalled driving as the truck left the Deshnod residence, yet not recall driving at the time of the accident. An interrogator who was unaware of evidence that the truck stopped at Larry Mark's residence would have erroneously equated an admission that Defendant drove away from the Deshnod residence as a confession to driving at the time of

---

including officers and suspects, forget facts or reconstruct and interpret them differently." *Id.* at 5. Problems with "disparities in perception" are heightened where, as here the interrogators and the suspect are from different cultures.

the accident,  just as Agent Sullivan did.  The Court is concerned that Agent Sullivan, by her

manner of questioning, led Defendant to accept the flawed hypothesis that if she was driving as

the truck left the Deshnod residence, she must have been driving at the time of the accident.[4]

This is borne out by Defendant's statement that  "it was likely that [I] was the driver considering

that [I] had been the driver throughout that day,"  [Ex. R. at 3] and her statement "[I] do[] not

feel any one else could have been driving the vehicle" [Ex. S. at 1].   Defendant appears to this

Court to have been reasoning by inference from the incomplete facts provided by Agent Sullivan

rather than actually recalling the accident. Agent Mackay, who as noted above was aware of the

facts, allowed Agent Sullivan to proceed with an interrogation that was based on erroneous

assumptions about key facts. Indeed, in his own interrogation he built on the situation created by

Agent Sullivan's reliance on incomplete facts.  As a result, Defendant was never asked questions

based on the actual facts such as "do you recall stopping at Larry Mark's house?  or ""who was

driving when the truck left Larry Mark's residence?"

**Conclusion**

The United States, not Defendant, bears the burden of proof.  The United States must

convince the Court, by a preponderance of the evidence, that Defendant's confession was

voluntary.  No single factor is determinative in the analysis.  Here, the evidence discloses that

during her interrogation, Defendant, a Navajo woman, was emotionally vulnerable, was fearful

---

[4]John E. Reid & Associates, a leading provider of training in interrogation techniques, urges investigators interrogating a suspect who claims to have memory loss during the period of the crime to (1) not try to convince the suspect that she committed the crime; (2) not lie to the suspect about having incriminating evidence and (3) make certain the suspect's confession contains valid corroboration.  *Investigator Tips:  Civil Liabilities Associated with False Confessions*, available at http://www.reid.com/educational_info/r_tips.html?serial+125727633.

of losing her children, was experiencing pain resulting from severe injuries sustained in the accident, and was on several medications including percocet, oxycodone and muscle relaxants. Most importantly, there are good grounds to believe that at the time of her interrogation Defendant had no actual recollection of the events immediately preceding the accident, including who was driving at the time of the accident. In light of all of the circumstances, this Court concludes that the United States has not met its burden of proof. The United States has not persuaded this Court that it is more likely than not that Defendant's inculpatory statements were her own voluntary recollection of events as opposed to the products of suggestive and confrontational questioning by Agents Sullivan and Mackay that overbore her will.

Because the United States has not met its burden of demonstrating that Defendant's inculpatory statements were made voluntarily, her statements must be suppressed.

**WHEREFORE,**

**IT IS THEREFORE HEREBY ORDERED** that Defendant's *Motion to Suppress Involuntary Statements* [Doc. 15] is **GRANTED**.

**So ordered this 26th day of August, 2013.**

_____
M. CHRISTINA ARMIJO
CHIEF UNITED STATES DISTRICT JUDGE